**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STEVEN R. NUSBAUM, derivatively on behalf of HONEYWELL INTERNATIONAL INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-00898-CFC |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| DARIUS E. ADAMCZYK, DUNCAN B. ANGOVE, WILLIAM S. AYER, KEVIN BURKE, JAIME CHICO PARDO, D. SCOTT DAVIS, LINNET F. DEILY, JUDD A. GREGG, CLIVE R. HOLLICK, GRACE D. LIEBLEIN, GEORGE PAZ, ROBIN L. WASHINGTON, DAVID M. COTE, GREG LEWIS, and THOMAS A. SZLOSEK, | ) ) ) ) ) ) ) ) ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Defendants, | ) ) ) | |
| and | ) ) | |
| HONEYWELL INTERNATIONAL INC., | ) ) | |
| Nominal Defendant. | ) ) | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Steven R. Nusbaum ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Honeywell International Inc. ("Honeywell" or the "Company"), files this Verified Stockholder Derivative Complaint against Individual Defendants Darius E. Adamczyk ("Adamczyk"), Duncan B. Angove ("Angove"), William S. Ayer ("Ayer"), Kevin Burke ("Burke"), D. Scott Davis ("Davis"), Linnet F. Deily ("Deily"), Judd A. Gregg ("Gregg"), Clive R. Hollick ("Hollick"), Grace D. Lieblein ("Lieblein"), Jaime Chico Pardo ("Pardo"), George Paz ("Paz"), Robin L. Washington ("Washington"), David M. Cote ("Cote"), Greg Lewis ("Lewis"), and Thomas A. Szlosek ("Szlosek") (collectively, the "Individual Defendants," and

together with Honeywell, the "Defendants") for violations of Sections 10(b) of the Securities

Exchange Act of 1934 (the "Securities Exchange Act") and Rule 10b-5 promulgated thereunder,

breaches of their fiduciary duties of loyalty and good faith, waste of corporate assets, and unjust

enrichment. Plaintiff alleges the following based upon personal knowledge as to his own acts and,

as to all other matters, based upon, among other things, information and belief developed from the

investigation and analysis by his counsel, including a review and analysis of (a) documents

obtained by means of a request for inspection of books and records under 8 *Del. C.* § 220 ("Section

220"); (b) Defendants' public documents, conference calls, and announcements made by

Defendants; (c) United States Securities and Exchange Commission ("SEC") filings, wire and

press releases published by and regarding Honeywell, legal filings, news reports, securities

analysts' reports and advisories about the Company, and information readily obtainable on the

Internet; and (d) allegations in the pending securities fraud class action styled *Kanefsky v.

Honeywell International Inc., et al.*, No. 2:18-cv-15536-WJM-SCM (D.N.J.). Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a stockholder derivative action seeking to remedy wrongdoing committed

by Honeywell's directors and officers from May 24, 2018 through October 19, 2018, inclusive (the

"Relevant Period") for breaches of their fiduciary duties of loyalty and good faith and for making

materially false and misleading statements about the Company's Bendix legacy asbestos-related

liability.

2.      According to its annual report for the fiscal year ended December 31, 2018 (the

"2018 Form 10-K"), Honeywell "invents and commercializes technologies that address some of

the world's most critical challenges around energy, safety, security, productivity and global urbanization. As a diversified technology and manufacturing company, [it] blend[s] physical products with software to serve customers worldwide with aerospace products and services, energy efficient products and solutions for businesses, specialty chemicals, electronic and advanced materials, process technology for refining and petrochemicals, and productivity, sensing, safety and security technologies for buildings and industries."

3.  Honeywell inherited asbestos liability from two subsidiaries it had subsequently disposed of: North American Refractories Company ("NARCO") and Bendix Friction Materials ("Bendix"). NARCO was sold in 1986, Bendix in 2014.

4.  NARCO asbestos liability claimants are primarily individuals who allege exposure to NARCO asbestos-containing refractory products in the workplace.

5.  Bendix used asbestos in its brake and clutch automotive products until early this century, and Bendix asbestos liability claimants include both individuals who performed brake replacements and those who were in the vicinity of such persons.

6.  Despite their apparent similarities, Honeywell used different accrual methods to account for NARCO and Bendix asbestos-related claims. According to its annual report for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), Honeywell accrued for NARCO claims as follows:

> we accrued for pending claims based on terms and conditions in agreements with NARCO, its former parent company, and certain asbestos claimants, and an estimate of the unsettled claims pending as of the time NARCO filed for bankruptcy protection. We also accrued for the estimated value of future NARCO asbestos related claims expected to be asserted against the NARCO Trust. The estimate of future NARCO claims was prepared in 2002, in the same year NARCO filed for bankruptcy protection, using NARCO tort system litigation experience based on a commonly accepted methodology used by numerous bankruptcy courts addressing 524(g) trusts. Accordingly, the estimated value of future NARCO asbestos claims was prepared before there was data on claims filings and payment rates in the

NARCO Trust under the Trust Distribution Procedures and also prepared when the stay of all NARCO asbestos claims was in effect (which remained in effect until NARCO emerged from Bankruptcy protection). Some critical assumptions underlying this commonly accepted methodology included claims filing rates, disease criteria and payment values contained in the Trust Distribution Procedures, estimated approval rates of claims submitted to the NARCO Trust and epidemiological studies estimating disease instances. The estimated value of the future NARCO liability reflects claims expected to be asserted against NARCO over a fifteen year period. This projection resulted in a range of estimated liability of $743 million to $961 million. We believe that no amount within this range is a better estimate than any other amount and accordingly, we have recorded the minimum amount in the range. Given the Trust's lack of sufficient claims processing experience since NARCO emerged from bankruptcy protection, it is not yet possible to reliably estimate future claim costs based on actual Trust experience.

7.     The methodology used to accrue for Bendix claims was different.  According to the

2017 Form 10-K:

we accrued for the estimated value of pending claims using average resolution values for the previous five years. We also accrued for the estimated value of future anticipated claims related to Bendix for the next five years based on historic claims filing experience and dismissal rates, disease classifications, and average resolution values in the tort system for the previous five years. In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, *we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years*.

(Emphasis added).

8.     The Company would concede on August 23, 2018 that:  its failure to estimate

Bendix liability beyond five years was inconsistent with Accounting Standards Codification 450,

Contingencies ("ASC 450"); its Bendix-related asbestos liability was $1,083 million higher than

the Company's prior estimates, offset by an additional $65 million in insurance assets; it had a

control deficiency; and prior periods would be revised when presented in reports to be filed for

future periods.  In addition, on October 19, 2018, the Company announced it was informed on

September 13, 2018 that the SEC had opened an investigation.

4

9.     The Company's faulty accounting for its Bendix asbestos liability was not discovered by the Audit Committee ("Audit Committee") of the Board of Directors (the "Board"), the Company's internal auditors, or its independent auditors.  Rather, it was found by the SEC in the course of reviewing the Draft Registration Statement (Form 10) for Garrett Motion Inc. ("Garrett"), which was filed with the SEC on May 1, 2018.  During 2017-18, the Company was in the process of a tax-free spin-off to Honeywell shareowners of its Transportation Systems business, part of its Aerospace segment, into Garrett, a standalone publicly-traded company, which was completed on October 1, 2018.  ███████████████████████

████[1] On May 24, 2018, the SEC provided comments on Garrett's Draft Registration Statement and questioned why "you do not believe that you have a reasonable basis for estimating asbestos claims beyond the next five years."

10.     Garrett amended the Draft Registration Statement on June 8, 2018, and Garrett and the SEC exchanged correspondence about the "estimated liability for resolution of pending claims . . . and future Bendix-related asbestos claims that are deemed to be probable and reasonably estimable" on June 8, June 21, June 29, and July 30, 2018.  ████████████████
████████████████████████████

11.     On August 8, 2018, Garrett wrote to the SEC and conceded "[u]pon thorough and thoughtful consideration of the Staff's comments and of the appropriate application of [ASC 450], *Honeywell* has determined that *it* had not appropriately applied the provisions of ASC 450 when measuring its asbestos liabilities related to unasserted Bendix claims. Specifically, *Honeywell* concluded that the appropriate application of ASC 450 with respect to unasserted Bendix-related

---

[1] ████████████████████████████████████████████
████████████████

asbestos claims is to reflect the full term of the epidemiological projections in its measurement of such liability." (Emphasis added).

12.     The August 8 letter also said, "[a]s a result of the foregoing, *Honeywell* plans to revise its historical consolidated financial statements in future filings to reflect the full term of the epidemiological projections in its measurement of liability for unasserted Bendix-related asbestos claims. While immaterial to Honeywell, *this planned revision of Honeywell's historical consolidated financial statements has resulted in a restatement of the Company's historical Combined Financial Statements.* Among other things, Amendment No. 2 [to Garrett's Draft Registration Statement on Form 10] reflects this restatement as well as a discussion of the material weakness in the Company's internal control over financial reporting that accompanied the restatement." (Emphasis added).

13.     Garrett filed a second amendment to the Draft Registration Statement on August 8.

14.     Once the issue of Garrett's accounting for future asbestos liability was resolved, the SEC turned its attention to Honeywell.  On August 14, 2018, the SEC wrote to Honeywell with a comment on the 2017 Form 10-K.  Specifically, the SEC inquired why Honeywell "use[s] different time periods for estimating the liabilities for future asbestos claims for [its] Bendix products asbestos liability and [its] NARCO-related asbestos liability."  The SEC requested "an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods."  It also said "[t]o the extent you determine that the specific future time periods used were incorrect, please provide us with a materiality analysis and your assessment of whether there was a material weakness in internal controls over financial reporting."

15.     This correspondence was not released to the public until October 10, 2018.

16.     Honeywell responded to the SEC on August 20, 2018, and agreed to change its

accrual period for Bendix asbestos liability, stating in relevant part:

> For Bendix, we believe that the accrual after the change to a terminal value horizon
> is appropriate as it is probable and reasonably estimable given the quality and
> quantity of reliable claims data in the tort system.  For the NARCO Trust, we
> believe that an accrual is necessary despite the challenges of estimating that accrual
> without sufficiently reliable data, and we believe our accrual estimation
> methodology (established in 2002) is the most reasonable approach in the absence
> of a more robust and reliable data set.  The Company has attempted to generate a
> better estimate of the accrual with the assistance of external experts (valuation
> experts and law firms) who concur with our assessment that the current inadequate
> data set does not present an opportunity to further refine the accrual.

The Company also asserted in the letter it did not "believe that the above-described change in

accounting reflects a material error" or "that the control deficiency that gave rise to the error

represents a material weakness in internal control over financial reporting."

17.     This correspondence was not released to the public until October 10, 2018.

18.     On August 23, 2018, three days after responding confidentially to the SEC,

Honeywell filed a Form 8-K announcing the change in the accounting treatment of its legacy

Bendix asbestos liabilities.  The Form 8-K said "[t]he Company concluded that the revision was

not material to any prior period financial statements, and therefore prior periods will be revised

when they are presented in reports to be filed for future periods."  The exhibit to the Form 8-K

disclosed that by estimating the Company's "liability for unasserted Bendix asbestos-related

claims by considering the epidemiological projections through 2059 of future incidence of Bendix

asbestos-related disease . . . the Company's Bendix asbestos-related liability is estimated to be

$1,693 million as of June 30, 2018. *This is $1,083 million higher than the Company's prior

estimation which applied a five-year horizon when estimating the liability for unasserted Bendix

asbestos-related claims*. The Bendix asbestos-related insurance assets are estimated to be $187

million as of June 30, 2018, which is $65 million higher than the Company's prior estimate." (Emphasis added).

19.     The August 23 Form 8-K was filed with the SEC prior to the opening of trading. The shock of this bad news was mitigated by the filing of Garrett's Registration Statement prior to the opening of trading on August 23, 2018, as well as a Honeywell press release "rais[ing] its full-year 2018 adjusted earnings per share guidance by five cents to a new range of $8.10 to $8.20 primarily to reflect continued confidence in the strength of its end markets and growth in long-cycle orders and backlog, as well as an accounting change related to Bendix asbestos liabilities."

20.     On October 10, 2018, the SEC released during trading hours its August 14 and 20 correspondence with Honeywell regarding its asbestos liability accrual.  Shares of Honeywell stock, which closed at $159.93 per share on October 9, 2018, lost $4.30 per share, or 2.7%, to close at $155.63 on October 10.  By October 11, Honeywell's shares had fallen to a closing price of $152.65.

21.     On October 19, 2018, Honeywell filed its Form 10-Q for the quarter ended September 30, 2018.  The Form 10-Q reported the change to the Bendix asbestos liability accrual methodology and provided updated asbestos liability and insurance coverage as of December 31, 2017.  The Form 10-Q also stated the Company was advised by the SEC on September 13, 2018, "following completion of Corporation Finance's review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter. Honeywell intends to provide requested information and otherwise fully cooperate with the SEC staff."

22.     The Form 10-Q was filed prior to the opening of trading on October 19.  Shares of Honeywell stock, which closed at $154.21 per share on October 18, 2018, lost $1.71, or 1.1%, to

close at $152.50.  By October 29, 2018, the share price of Honeywell stock had steadily declined to a closing price of $141.06, a decline of 8.5% since October 18.

23.     Garrett's correspondence with the SEC was signed by Su Ping Lu ("Lu"), Garrett's sole director at the time who was also Honeywell's Assistant General Counsel. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

24.     Individual Defendants Burke, Davis, Deily, Gregg, Paz, and Washington were members of the Audit Committee at all relevant times.  These six Audit Committee directors constitute a majority of Honeywell's current twelve-person Board.  Consequently, a majority of the Board knew no later than May 24, 2018, that the SEC likely would not accept Garrett's accounting for its Bendix asbestos liability, and by extension would not accept Honeywell's similar accounting from which it was derived.  In addition, the members of the Audit Committee knew, or at a minimum showed reckless indifference, to the fact that Honeywell's faulty accounting would result in a control deficiency.  Nevertheless, they hid these material facts from the public for three months until August 23, 2018, breaching their fiduciary duties of loyalty and good faith.

25.     These six directors face a substantial likelihood of liability for their breaches of fiduciary duties, making demand upon the Board futile.

26.     The Company's Form 10-Q for the quarter ended June 30, 2018, filed with the SEC on July 20, 2018 (the "2Q18"), contained materially false and misleading statements in that it showed Honeywell's Bendix asbestos liability to be $616 million as of December 31, 2017 and $610 million as of June 30, 2018, not $1,703 million as of December 31, 2017 and $1,693 million as of June 30, 2018 as the Company subsequently admitted.

27.     Also, the certifications by Individual Defendants Adamczyk and Szlosek, Honeywell's Chief Executive Officer ("CEO") and former Chief Financial Officer ("CFO"), respectively, accompanying the 2Q18 were false and/or materially misleading because the Q2'18 10-Q in fact did not "fairly present in all material respects the financial condition."

28.     Honeywell's reputation and credibility has suffered immeasurable harm due to Defendants' improprieties.  In addition, the Company must pay the costs to defend the securities class action filed in response to the improper and materially misleading public statements, exposing the Company to hundreds of millions more in potential liability and the SEC investigation, which may result in millions of dollars in fines and penalties.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to §§ 10(b) of the Securities Exchange Act (15 U.S.C. §§ 78j(b)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and Delaware common law.

30.     This Court has jurisdiction over the federal claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27(a) of the Securities Exchange Act, 15 U.S.C. § 78aa.

31.     This Court has jurisdiction over the state claims asserted in this action pursuant to 28 U.S.C. § 1332.

32.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

33.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Honeywell is incorporated within this District.

34.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

35.     Plaintiff Steven R. Nusbaum was a stockholder of Honeywell at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Honeywell stockholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

36.     Nominal Defendant Honeywell is incorporated in Delaware, with its principal executive offices located at 115 Tabor Road, Morris Plains, New Jersey 07950.  Honeywell's common stock is traded on the NYSE under the ticker symbol "HON."

**Defendants**

37.     Defendant Darius E. Adamczyk has been the Chairman and CEO of Honeywell since April 2018.  Adamczyk was President and CEO from March 2017 to April 2018 and Chief Operating Officer from April 2016 to March 2017.  Upon information and belief, Adamczyk is a citizen of New Jersey.

38.     Adamczyk was awarded the following compensation in 2018:

| Base Salary | Annual Incentive Plan (ICP) | 2018-2020 Performance Plan Units | Stock Options | Restricted Stock Units | Total Annual Direct Compensation |
|---|---|---|---|---|---|
| $1,571,154 | $4,100,000 | $6,375,720 | $3,185,655 | $3,185,495 | $18,418,024 |

39.     Defendant Duncan B. Angove has been a member of the Board since February 2018.  Upon information and belief, Angove is a citizen of Georgia.

40.     Angove was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $173,434 | $50,116 | $50,314 | $ --- | $    4 | $273,868 |

41.     Defendant William S. Ayer has been a member of the Board since 2015.  Upon information and belief, Ayer is a citizen of Washington.

42.     Ayer was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $180,000 | $50,116 | $50,314 | $ --- | $25,004 | $305,434 |

43.     Defendant Kevin Burke has been a member of the Board since 2010.  Burke served on the Audit Committee at all relevant times.  Upon information and belief, Burke is a citizen of Florida.

44.     Burke was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $185,000 | $50,116 | $50,314 | $ --- | $25,004 | $310,434 |

45.     Defendant D. Scott Davis has been a member of the Board since 2006.  Davis served on the Audit Committee at all relevant times.  Upon information and belief, Davis is a citizen of Georgia.

46.     Davis was awarded the following compensation in 2018:

| Fees Earned | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|

12

| | | | Compensation Earnings($) | | |
|---|---|---|---|---|---|
| or Paid in Cash($) | | | | | |
| $205,000 | $50,116 | $50,314 | $10,319 | $ 1,991 | $317,740 |

47.    Defendant Linnet F. Deily has been a member of the Board since 2006.  Deily served on the Audit Committee at all relevant times.  Upon information and belief, Deily is a citizen of Texas.

48.    Deily was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $205,000 | $50,116 | $50,314 | $ --- | $30,035 | $335,465 |

49.    Defendant Judd A. Gregg has been a member of the Board since 2011.  Gregg served on the Audit Committee at all relevant times.  Upon information and belief, Gregg is a citizen of New Hampshire.

50.    Gregg was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $185,000 | $50,116 | $50,314 | $ --- | $25,004 | $310,434 |

51.    Defendant Clive R. Hollick has been a member of the Board since 2004.  Upon information and belief, Hollick is a citizen of the United Kingdom.

52.    Hollick was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $180,000 | $50,116 | $50,314 | $11,399 | $45,339 | $337,168 |

53.    Defendant Grace D. Lieblein has been a member of the Board since 2013.  Upon information and belief, Lieblein is a citizen of Michigan.

54.    Lieblein was awarded the following compensation in 2018:

13

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $180,000 | $50,116 | $50,314 | $ --- | $15,227 | $295,657 |

55.     Defendant Jaime Chico Pardo has been a member of the Board since 2000 and was the Lead Director at all relevant times.  Pardo was a member ex officio of the Audit Committee at all relevant times.  Upon information and belief, Pardo is a citizen of Mexico.

56.     Pardo was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $215,000 | $50,116 | $50,314 | $ --- | $27,335 | $342,765 |

57.     Defendant George Paz has been a member of the Board since 2009.  Paz chaired the Audit Committee at all relevant times.  Upon information and belief, Paz is a citizen of Missouri.

58.     Paz was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $205,000 | $50,116 | $50,314 | $ --- | $25,004 | $330,434 |

59.     Defendant Robin L. Washington has been a member of the Board since 2013. Washington served on the Audit Committee at all relevant times.  Upon information and belief, Washington is a citizen of California.

60.     Washington was awarded the following compensation in 2018:

| Fees Earned or Paid in Cash($) | Stock Awards($) | Option Awards($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings($) | All Other Compensation($) | Total($) |
|---|---|---|---|---|---|
| $194,287 | $50,116 | $50,314 | $ --- | $  4 | $294,721 |

61.     Defendant David M. Cote was Honeywell's CEO until March 2017 and Executive Chairman until April 2018.  Upon information and belief, Cote is a citizen of Florida.

14

62.     Cote was awarded the following compensation in 2017:

| Base Salary | Annual Bonus | Stock Options | 2017-2019 Performance Plan-PSUs | 2016 Biennial-Performance RSUs | 2016-2017 Growth Plan | Total Annual Direct Compensation |
|---|---|---|---|---|---|---|
| $900,962 | $3,420,000 | $9,990,000 | $0 | $0 | $2,612,500 | $16,923,462 |

63.     Defendant Greg Lewis has been Honeywell's CFO since August 3, 2018.  Before that, Lewis was the Company's Vice President, Corporate Finance, with responsibility for Treasury, Tax, Audit, Business Analysis and Planning, Investor Relations, M&A, Real Estate, Pension, Finance Operations, and Enterprise Information Management beginning in May 2018. Upon information and belief, Lewis is a citizen of Minnesota.

64.     Lewis was awarded the following compensation in 2018:

| Base Salary | Annual Incentive Plan (ICP) | 2018-2020 Performance Plan Units | Stock Options | Restricted Stock Units | Total Annual Direct Compensation |
|---|---|---|---|---|---|
| $578,981 | $730,000 | $525,000 | $591,250 | $554,752 | $2,979,973 |

65.     Defendant Thomas A. Szlosek was Honeywell's CFO at all relevant times until August 3, 2018.  Upon information and belief, Szlosek is a citizen of New Jersey.

66.     Szlosek was awarded the following compensation in 2018:

| Base Salary | Annual Incentive Plan (ICP) | 2018-2020 Performance Plan Units | Stock Options | Restricted Stock Units | Total Annual Direct Compensation |
|---|---|---|---|---|---|
| $560,481 | $ — | $2,713,768 | $1,348,050 | $1,336,354 | $5,958,653 |

67.     The defendants described in ¶¶ 38-66 are referred to herein as the "Individual Defendants."

68.     The defendants described in ¶¶ 38-61 are referred to herein as the "Director Defendants."

69.     The defendants described in ¶¶ 44-51 & 58-61 are referred to herein as the "Audit Committee Defendants."

## INDIVIDUAL DEFENDANTS' DUTIES

70.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Honeywell and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Honeywell in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Honeywell and not in furtherance of their personal interest or benefit.

71.     Each director and officer of the Company owes and owed to Honeywell and its stockholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  Breaches of these duties cannot be exculpated.

72.     To discharge their duties, the officers and directors of Honeywell were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Honeywell were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

16

(d)      refrain from engaging in acts of self-dealing to enrich themselves at the expense of the Company and its investors;

(e)      remain informed as to how Honeywell conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)      truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

73.      The Company's web site states the following "Integrity and Compliance" standard for all Honeywell personnel, including directors:

> At Honeywell, we have a responsibility to conduct ourselves with the highest levels of integrity in everything we do. This helps us sustain the credibility of our brand, maintain our strong reputation, and build on our track record of growth and performance. From the shop floor to the boardroom, all Honeywell employees and representatives are held to the highest standard – and we cultivate a culture of not just meeting, but exceeding all laws and regulations in the countries where we do business.

74.      Honeywell's Business Code of Conduct provides the following under the subject of "Honest and Accurate Books and Records":

> Our shareowners rely on us to maintain accurate and complete books and records. These documents form the basis for all of our public disclosures and filings, which aim to give our Shareowners and the public an accurate view of our Company's operations and financial standing. In addition, Honeywell uses these documents to analyze Company operations and make important business decisions. We have a duty and a legal obligation to make sure that the information we submit in all Company records is complete, accurate, and understandable. This includes, but is not limited to, all of the information we provide in the following records:
>
> • Accounting and financial records

***

17

Honest and accurate books and records play a significant role in our Company's reputation. As such, we must **never** make a false representation in Company documents.

(Emphasis in original).

75. The Business Code of Conduct states the following about "Financial Disclosures and Fraud":

Those of us with finance and accounting responsibilities have a special duty to ensure that our Company's financial statements are true and fair. Since Honeywell is a U.S.-based public company, we must submit various financial reporting and other filings to U.S. regulatory authorities. It is critical that these documents are accurate and timely. Therefore, if you have related responsibilities, you must comply with the legal and regulatory requirements that govern these reports. You also must know and follow Honeywell's internal controls that govern the same. Inaccurate, incomplete, or untimely records or reporting may result in legal liability for those involved.

76. Under the Board's Audit Committee charter, the Audit Committee Defendants, Individual Defendants Burke, Davis, Deily, Gregg, Paz, and Washington, owe and/or owed specific additional duties to Honeywell. The Audit Committee Charter provides, among other things:

**III. Purpose**

The Committee shall provide assistance to the Board of Directors in fulfilling its responsibilities relating to oversight of (i) the *Company's accounting and financial reporting practices and internal control system* . . . and (iv) *compliance with legal and regulatory requirements*.

**IV. Responsibilities**

The following shall be the primary activities of the Committee in carrying out its oversight responsibilities. The Committee may, from time to time, alter its procedures as appropriate given the circumstances and shall perform such other functions as may be assigned to it by law, the Company's charter, the By-laws or by the Board.

\*\*\*

18

3.      [T]he Committee will advise the Board of Directors whether it recommends that the audited financial statements be included in the Company's Annual Report on Form 10-K and prepare the Committee report to be included in the Company's proxy statement *in accordance with Securities and Exchange Commission rules*.

4.      Review with management and the independent auditors, prior to the filing thereof, the Company's annual and interim financial results (including Management's Discussion and Analysis) to be included in Forms 10-K and 10-Q, respectively, and the matters required to be communicated to the Audit Committee *under generally accepted auditing standards and rules of the Securities and Exchange Commission. . . .*

\*\*\*

6.      Review and discuss earnings releases, guidance releases and presentations to be made public in connection with such releases, including the types of financial information to be disclosed in connection with such disclosures.

\*\*\*

11.      Review, with management and the independent auditor, the Company's internal control over financial reporting, including management's annual assessment of the adequacy and effectiveness of internal control over financial reporting, any significant deficiencies or material weaknesses in internal controls (including the remediation thereof), any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting, and any changes in internal controls that have materially affected or are likely to materially affect internal control over financial reporting. The foregoing shall include review of reports of the independent auditor and the chief internal auditor related to the adequacy of the Company's internal accounting controls, including any management letters and management's responses to recommendations made by the independent auditor or the chief internal auditor.

12.      Review, with appropriate members of senior management, the Company's disclosure controls and procedures, including management's conclusions about the effectiveness thereof and any material non-compliance therewith, and any audit steps adopted in light of any such non-compliance.

\*\*\*

17.      Review material legal and compliance matters involving the Company periodically with the Company's Senior Vice President and General Counsel and the Vice President – Global Compliance, it being understood that each

such individual has express authority to communicate personally with the Chair of the Audit Committee about any such matter as appropriate.

77.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings, including the 2Q18. They breached their fiduciary duties of loyalty and good faith by approving and failing to correct Honeywell's flawed accounting for its accrued Bendix asbestos liability, failing to do so for months after the SEC questioned Garrett's, and by extension Honeywell's, treatment of such liabilities. Perhaps most significantly, the Audit Committee Defendants' breaches of their fiduciary duties of loyalty and good faith have resulted in the initiation of an SEC investigation.

78.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Honeywell, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Honeywell has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Honeywell, regarding the Individual Defendants' management

of Honeywell's operations and the Company's noncompliance with ASC 450 and generally accepted accounting principles ("GAAP"); (ii) artificially inflate the Company's stock price; and (iii) enhance the Individual Defendants' executive and directorial positions at Honeywell and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

81. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements and operate with inadequate internal controls and risk management procedures.

82. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

83. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that

wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

85.     Honeywell had a history of estimating accruing its asbestos liability differently for

its former NARCO and Bendix subsidiaries.   For example, Note 19, Commitments and

Contingencies, in the 2018 10-K, stated the following about NARCO:

> ***NARCO Products*** –In connection with NARCO's emergence from bankruptcy on
> April 30, 2013, a federally authorized 524(g) trust (NARCO Trust) was established
> for the evaluation and resolution of all existing and future NARCO asbestos claims.
> Both Honeywell and NARCO are protected by a permanent channeling injunction
> barring all present and future individual actions in state or federal courts and
> requiring all asbestos related claims based on exposure to NARCO asbestos-
> containing products to be made against the NARCO Trust. The NARCO Trust
> reviews submitted claims and determines award amounts in accordance with
> established Trust Distribution Procedures approved by the Bankruptcy Court which
> set forth the criteria claimants must meet to qualify for compensation including,
> among other things, exposure and medical criteria that determine the award amount.
> In addition, Honeywell provided, and continues to provide, input to the design of
> control procedures for processing NARCO claims, and has on-going audit rights to
> review and monitor the claims processor's adherence to the established
> requirements of the Trust Distribution Procedures.
>
> Honeywell is obligated to fund NARCO asbestos claims submitted to the NARCO
> Trust which qualify for payment under the Trust Distribution Procedures (Annual
> Contribution Claims), subject to annual caps of $140 million in 2018 and $145
> million for each year thereafter. However, the initial $100 million of claims
> processed through the NARCO Trust (the Initial Claims Amount) will not count
> against the annual cap and any unused portion of the Initial Claims Amount will
> roll over to subsequent years until fully utilized. In 2015, Honeywell filed suit
> against the NARCO Trust in Bankruptcy Court alleging breach of certain
> provisions of the Trust Agreement and Trust Distribution Procedures. The parties
> agreed to dismiss the proceeding without prejudice pursuant to an 18 month
> Standstill Agreement. Claims processing continued during this period as the parties
> attempted to resolve disputed issues. The Standstill Agreement expired on October
> 12, 2017. Notwithstanding its expiration, claims processing continues, and
> Honeywell continues to negotiate and attempt to resolve remaining disputed issues
> (that is, instances where Honeywell believes the Trust is not processing claims in
> accordance with established Trust Distribution Procedures). Honeywell reserves its
> right to seek judicial intervention should negotiations fail or prove futile. As of

December 31, 2017, Honeywell has not made any payments to the NARCO Trust for Annual Contribution Claims.

Honeywell is also responsible for payments due to claimants pursuant to settlement agreements reached during the pendency of the NARCO bankruptcy proceedings that provide for the right to submit claims to the NARCO Trust subject to qualification under the terms of the settlement agreements and Trust Distribution Procedures criteria (Pre-established Unliquidated Claims), which amounts are estimated at $150 million and are expected to be paid during the initial years of trust operations ($5 million of which has been paid since the effective date of the NARCO Trust). Such payments are not subject to the annual cap described above.

Our consolidated financial statements reflect an estimated liability for Pre-established Unliquidated Claims ($145 million), as well as unsettled claims pending as of the time NARCO filed for bankruptcy protection and operating and legal costs related to the Trust (collectively $19 million) and for the estimated value of future NARCO asbestos claims expected to be asserted against the NARCO Trust ($743 million). *The estimate of future NARCO claims was prepared in 2002, in the same year NARCO filed for bankruptcy protection, using NARCO tort system litigation experience based on a commonly accepted methodology used by numerous bankruptcy courts addressing 524(g) trusts. Accordingly, the estimated value of future NARCO asbestos claims was prepared before there was data on claims filings and payment rates in the NARCO Trust under the Trust Distribution Procedures and also prepared when the stay of all NARCO asbestos claims was in effect (which remained in effect until NARCO emerged from Bankruptcy protection). Some critical assumptions underlying this commonly accepted methodology included claims filing rates, disease criteria and payment values contained in the Trust Distribution Procedures, estimated approval rates of claims submitted to the NARCO Trust and epidemiological studies estimating disease instances. The estimated value of the future NARCO liability reflects claims expected to be asserted against NARCO over a fifteen year period. This projection resulted in a range of estimated liability of $743 million to $961 million. We believe that no amount within this range is a better estimate than any other amount and accordingly, we have recorded the minimum amount in the range.* Given the Trust's lack of sufficient claims processing experience since NARCO emerged from bankruptcy protection, it is not yet possible to reliably estimate future claim costs based on actual Trust experience.

Our insurance receivable corresponding to the estimated liability for pending and future NARCO asbestos claims reflects coverage which reimburses Honeywell for portions of NARCO-related indemnity and defense costs and is provided by a large number of insurance policies written by dozens of insurance companies in both the domestic insurance market and the London excess market. We conduct analyses to estimate the probable amount of insurance that is recoverable for asbestos claims. While the substantial majority of our insurance carriers are solvent, some of our individual carriers are insolvent, which has been considered in our analysis of

probable recoveries. We made judgments concerning insurance coverage that we believe are reasonable and consistent with our historical dealings and our knowledge of any pertinent solvency issues surrounding insurers.

Projecting future events is subject to many uncertainties that could cause the NARCO-related asbestos liabilities or assets to be higher or lower than those projected and recorded. Given the uncertainties, we review our estimates periodically, and update them based on our experience and other relevant factors. Similarly, we will reevaluate our projections concerning our probable insurance recoveries in light of any changes to the projected liability or other developments that may impact insurance recoveries.

(Emphasis added).

86.     NARCO had a total asbestos liability of $907 million as of December 31, 2017, with expected insurance recoveries of $312 million.  The amount accrued for update to estimated liability in 2017 was $31 million.

87.     In contrast, Note 19 in the 2018 10-K, stated the following about Bendix:

***Bendix Products***—The following tables present information regarding Bendix related asbestos claims activity:

| Claims Activity | Years Ended December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Claims Unresolved at the beginning of year | 7,724 | 7,779 |
| Claims Filed | 2,645 | 2,830 |
| Claims Resolved | (4,089) | (2,885) |
| Claims Unresolved at the end of year | 6,280 | 7,724 |

| Disease Distribution of Unresolved Claims | December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Mesothelioma and Other Cancer Claims | 3,062 | 3,490 |
| Nonmalignant Claims | 3,218 | 4,234 |
| Total Claims | 6,280 | 7,724 |

Honeywell has experienced average resolution values per claim excluding legal costs as follows:

24

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2017** | **2016** | **2015** | **2014** | **2013** |
| | (in whole dollars) | | | | |
| Malignant claims | $ 56,000 | $ 44,000 | $ 44,000 | $ 53,500 | $ 51,000 |
| Nonmalignant claims | $ 2,800 | $ 4,485 | $ 100 | $ 120 | $ 850 |

*It is not possible to predict whether resolution values for Bendix-related asbestos claims will increase, decrease or stabilize in the future.*

Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. *We have valued Bendix pending and future claims using average resolution values for the previous five years.* We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.

The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. *In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.* The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

Our insurance receivable corresponding to the liability for settlement of pending and future Bendix asbestos claims reflects coverage which is provided by a large number of insurance policies written by dozens of insurance companies in both the domestic insurance market and the London excess market. Based on our ongoing analysis of the probable insurance recovery, insurance receivables are recorded in the financial statements simultaneous with the recording of the estimated liability for the underlying asbestos claims. This determination is based on our analysis of the underlying insurance policies, our historical experience with our insurers, our ongoing review of the solvency of our insurers, judicial determinations relevant to our insurance programs, and our consideration of the impacts of any settlements reached with our insurers.

Honeywell believes it has sufficient insurance coverage and reserves to cover all pending Bendix-related asbestos claims and Bendix-related asbestos claims estimated to be filed within the next five years. *Although it is impossible to predict the outcome of either pending or future Bendix-related asbestos claims,* we do not believe that such claims would have a material adverse effect on our consolidated financial position in light of our insurance coverage and our prior experience in resolving such claims. If the rate and types of claims filed, the average resolution

value of such claims and the period of time over which claim settlements are paid (collectively, the Variable Claims Factors) do not substantially change, Honeywell would not expect future Bendix-related asbestos claims to have a material adverse effect on our results of operations or operating cash flows in any fiscal year. No assurances can be given, however, that the Variable Claims Factors will not change.

(Emphasis added).

88.     Bendix had a total asbestos liability of $616 million as of December 31, 2017, with expected insurance recoveries of $123 million.   The amount accrued for update to estimated liability in 2017 was $199 million.

89.     As Honeywell was forced to admit in August 2018, the accounting for Bendix asbestos liability was not in accordance with ASC 450, and the Company *had "a reasonable basis for estimating asbestos claims beyond the next five years."*

90.     By letter dated May 24, 2018, the SEC provided comments on Garrett's Draft Registration Statement.   The letter, and all subsequent relevant correspondence from the SEC to Garrett, was addressed to Lu.   Comment 13 stated as follows:

> Notes to Combined Financial Statements
> Note 18. Commitments and Contingencies
> Asbestos Matters, page F-26
>
> 13.     We note your disclosure that the liability for future claims represents the estimated value of future asbestos-related bodily injury claims expected to be asserted against you over the next five years. You say that in light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, you do not believe that you have a reasonable basis for estimating asbestos claims beyond the next five years.
>
> ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied. *Therefore, we do not believe there is a conceptual basis for limiting an ASC 450 assessment to a certain time horizon. We believe your ASC 450 assessment should consider all claims without limitation to a specific time period. It is unclear how the ASC 450 assessment was considered for periods outside of the five year time horizons.*

> Based on your history with asbestos claims, *it seems unlikely to us that the low end of your range of probable losses for time periods beyond five years is zero*. Therefore, please explain in greater detail how you determined that it was not possible to make any estimate for probable losses (including any legal costs for claims where an accrual has already been provided) for periods beyond five years from the date of the financial statements.

(Emphasis added).

91.     "Notes to Combined Financial Statements" referred to Honeywell's combined financial statements for its Transportation Systems Business, which were an exhibit to Garrett's Draft Registration Statement.  Thus, the SEC's comments applied equally to both Garrett and Honeywell.

92.     Because Lu was an Assistant General Counsel at Honeywell as well as the sole initial director of Garrett ████████████████████████████████ it is reasonable to infer she immediately advised the Audit Committee and senior management of the SEC's position.

93.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

94.     Garrett filed Amendment No. 1 to the Draft Registration Statement on June 8, 2018. In addition, Lu wrote to the SEC on June 8 behalf of Garrett to respond to the SEC's May 24, 2018 letter.  The June 8 letter stated as follows regarding Comment 13:

**Overview**

Honeywell is a defendant in asbestos-related personal injury actions related to its former Bendix Friction Materials (Bendix) business which was sold in 2014. For a period of time in the past, Bendix manufactured automotive brake linings that contained chrysotile asbestos in an encapsulated form. Claimants consist largely of individuals who allege exposure to asbestos in the brake linings from either having performed, or having been in the vicinity of individuals who were performing, brake replacements.

The Company's combined financial statements reflect an estimated liability for resolution of pending claims (claims actually filed against Bendix as of the financial statement date) and future Bendix-related asbestos claims that are deemed to be probable and reasonably estimable. Consistent with ASC 450-20-S99-2, Honeywell's accounting policy is to recognize legal costs related to the Company's defense against Bendix-related asbestos claims on an incurred basis. Honeywell values both Bendix pending and future claims using average resolution values (the values of claims both settled and dismissed) for the previous five-year period. The liability for future claims represents the estimated value of asbestos-related bodily injury claims expected to be asserted against Bendix over the next five years. A third-party asbestos expert actuarial firm and outside legal counsel assist Honeywell in the development of the liability estimate for future claims. Such estimated cost of future Bendix-related asbestos claims is based on an epidemiological projection of the incidence of disease, Bendix historic claims filing experience and dismissal rates, disease classifications, and resolutions in the tort system for the previous five-year period.

Honeywell acknowledges that ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied. We also acknowledge that epidemiological projections of the incidence of disease extend well beyond a five-year time horizon. However, the incidence of disease does not capture the likelihood either of claims being asserted against Honeywell or of Honeywell incurring a liability. In fact, we believe both are subject to substantial uncertainty due to the nature of Bendix automotive brake linings, emerging scientific research and Honeywell's aggressive litigation strategy. As a result, and based on liability estimates for future claims developed with the assistance of a third party asbestos expert actuarial firm and outside legal counsel, Honeywell selected a five-year future time horizon as the reasonable basis for valuing possible future claims as we believe that any loss or range of loss for probable asbestos claims beyond the five-year period is not reasonably estimable. In particular:

- Scientific research is demonstrating that brake dust from automotive brakes does not cause disease and that mesothelioma is caused by other factors. Honeywell expects that emerging scientific research with respect to brake linings manufactured with chrysotile asbestos is likely to provide additional evidence that brake dust does not cause mesothelioma.

- Honeywell, along with other defendant companies, continues to pursue aggressive legal strategies to change substantive and procedural standards governing claims related to friction products like brake linings. This effort is primarily focused on strengthening product causation standards applied by the courts in asbestos personal injury cases as causation is a critical element of every asbestos claim. These litigation strategies have resulted in

some recent successes as we have seen tort causation requirements changed in several states in recent years (*e.g.,* Pennsylvania, Virginia and Ohio).

A more detailed discussion of both scientific research and litigation strategies can be found below.

While Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period (i.e., in year six), the inherent uncertainty that has resulted from emerging scientific and medical research and from volatility of legal standards in asbestos cases and rulings that we expect to continue have made it difficult to predict asbestos claim rates, settlement values and dismissal rates or to reasonably estimate any loss amount, or range of loss, for such claims beyond a five-year period.

**Scientific Research**

***

**Honeywell Litigation Strategy**

Honeywell also believes the amount of loss for asbestos claims cannot be reasonably estimated beyond five years because of aggressive efforts by Honeywell and other defendant companies to continue to change substantive and procedural standards governing asbestos claims, especially with respect to friction product related claims. Central to this effort is Honeywell and other defendants' focus on (a) the standard of proof required to demonstrate causation in asbestos personal injury cases, and (b) the standard for admissibility of plaintiffs' expert witness opinions on causation.

Causation is an essential element of every tort claim. Almost every jurisdiction's rules require plaintiff to prove, through expert testimony, that exposure to the product at issue *can* cause ("general causation") and *did* substantially contribute to the injury at issue ("specific causation"). There is no published peer-reviewed scientific or medical literature demonstrating that dust from brakes manufactured using asbestos can or does contribute to any disease, including mesothelioma. To overcome the complete absence of product specific evidence, plaintiffs have relied upon studies and testimony concerning "asbestos" generally and proffered expert opinion evidence to the effect that "every exposure" to any asbestos or asbestos containing product "contributes" to the onset of disease. Numerous courts relaxed both the burden of production and the standards for admissibility in asbestos cases long ago and continue to apply very relaxed standards. Nevertheless, Honeywell's position has consistently been that this "every" or "cumulative" exposure causation theory is fundamentally incompatible with traditional tort law requirements. Moreover, given that there is no scientific support for this theory (and given that it is contrary to the scientific findings published to date (*see above*)), Honeywell has consistently argued that expert testimony to this effect cannot satisfy most

jurisdiction's expert opinion admissibility standards (*e.g., Daubert* standard). In short, Honeywell has been aggressively arguing and litigating to re-establish traditional tort elements and evidentiary requirements in its brake dust cases.

Defendants' efforts – including Honeywell's aggressive appellate strategy – have had success. For instance, Honeywell, itself, has successfully regained traditional tort causation requirements in three key states, in decisions by each state's highest court. In Virginia, Pennsylvania, and, most recently, Ohio (*Schwartz v. Honeywell,* 2018), the highest state courts have held that the "every exposure" or "cumulative exposure" theory is either not adequate to satisfy or is incompatible with that state's causation requirement in tort cases. Courts in other jurisdictions – both state supreme courts (*e.g.,* Texas) and federal courts – have reached similar conclusions, in cases involving Honeywell or others. We have seen, and reasonably anticipate, changes in claim filing patterns because of decisions such as *Schwartz*.

Whether the "cumulative" exposure theory or generic causation testimony concerning asbestos (but not brake dust), in an asbestos friction products case is sufficient to satisfy New York's law is presently before the New York Court of Appeals, in *In re NYC Asbestos Litig. (Juni v. A.O. Smith)*. *Juni* has been fully briefed, but not yet set for argument. Honeywell is in the process of petitioning the Minnesota Supreme Court to take up this issue in a case it recently lost in the Minnesota intermediate appellate court, *Conda v. Honeywell.* Like the decisions in Virginia, Pennsylvania, and Ohio, state high court resolution of this central issue is expected to have a material impact on asbestos litigation in those jurisdictions. As a result, we expect continued volatility and uncertainty in predicting claims filings and outcomes in the short term.

**Revised Disclosure**

The Company acknowledges the Staff's comment and has included enhanced disclosure in the following sections of the Information Statement to indicate that (a) Honeywell recognizes it is probable that there will be asbestos claims filed against the Company beyond the five-year period, but (b) due to the reasons outlined above, the Company is not able to reasonably estimate any loss amount or range of loss beyond the five-year period.

<u>Note 18 for December 31, 2017 Financial Statements, pages F-28 and F-29; Note 10 for March 31, 2018 Financial Statements, page F-47</u>

Honeywell selected a five-year future time horizon as the basis for valuing probable future claims as we believe that the recognition of any loss for probable asbestos claims beyond the five-year period is not reasonably estimable due to the nature of Bendix automotive brake linings and Honeywell's aggressive litigation strategy. Specifically, scientific research is demonstrating that brake dust from Bendix automotive brake linings does not cause disease and that mesothelioma is caused

by other factors. Also, Honeywell, along with other defendant companies, continues to pursue aggressive legal strategies to change substantive and procedural standards governing claims relating to friction products like brake linings with a focus on strengthening product causation standards applied by the courts in asbestos personal injury cases. The inherent uncertainty that has resulted from emerging scientific and medical research and from the volatility of legal standards in asbestos cases and rulings that we expect to continue have made it difficult to predict asbestos claim rates, settlement values and dismissal rates in order to reasonably estimate any loss amount or range of loss for such claims beyond a five-year period.

Risk Factors, page 22

As of December 31, 2017, we have accrued $616 million of liability in connection with Bendix related asbestos representing the estimated liability for pending claims as well as future claims expected to be asserted over the next five years. While we believe that the amount of any loss, or range of loss, for future Bendix asbestos claims beyond the five-year period is not reasonably estimable due to ongoing scientific research and Honeywell's aggressive litigation strategy, we acknowledge that it is probable that there will be losses associated with Bendix claims beyond the five-year horizon.

(Emphasis in original).

95.    While Garrett admitted in the June 8 letter "that it is probable that there will be losses associated with Bendix claims beyond the five-year horizon," they clung to the position that "future Bendix asbestos claims beyond the five-year period is not reasonably estimable due to ongoing scientific research and Honeywell's aggressive litigation strategy."

96.    The SEC responded to Lu with further comments by letter dated June 21, 2018, which expressed its dissatisfaction with Garrett's June 8 letter. The SEC's letter said:

Amendment No. 1 to Form 10 filed June 8, 2018
Notes to Combined Financial Statements
Note 18. Commitments and Contingencies
Asbestos Matters, page F-27

1.    We note your response that you cannot reasonably estimate a liability for claims not yet asserted for a period beyond five years because the amount of loss cannot be reasonably estimated. Please tell us how and why you determined a five year time period to estimate losses for unasserted claims yields reliable estimates but time periods beyond five years cannot be

31

reasonably estimated. Specifically address how and why you determined trends over longer time periods are not more appropriate.

2.   We note your response that liability estimates for future claims were developed with the assistance of a third party asbestos expert actuarial firm and outside legal counsel and probable asbestos claims beyond the five-year period is not reasonably estimable, although Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period. Please tell us whether you (1) attempted to estimate a liability for potential claims beyond the five year period but concluded the resulting estimate of loss (or range) was not reasonable or (2) did not attempt to estimate a liability beyond the five year period because you believed you could not develop a reasonable estimate. If the former, tell us the results of your estimation including your estimated liability (or range thereof) as of December 31, 2017 and why you did not believe the estimate(s) to be reasonable.

3.   Please quantify for us the amount of the liability at December 31, 2016 that relates to potential claims not yet asserted.

97.   Lu responded on behalf of Garrett by letter dated June 29, 2018, and once again attempted to support Garrett's and Honeywell's position.  The letter stated in relevant part:

1.   *We note your response that you cannot reasonably estimate a liability for claims not yet asserted for a period beyond five years because the amount of loss cannot be reasonably estimated. Please tell us how and why you determined a five year time period to estimate losses for unasserted claims yields reliable estimates but time periods beyond five years cannot be reasonably estimated. Specifically address how and why you determined trends over longer time periods are not more appropriate.*

## Overview

It is important to understand Honeywell's unique position in the asbestos litigation landscape in order to understand why the five-year time period is the appropriate one for us to use in estimating losses for unasserted claims. Claimants in Bendix asbestos litigation consist largely of individuals who allege exposure to asbestos in brake linings from either having performed, or having been in the vicinity of individuals who were performing, brake replacements. They may also allege exposure to dust from the manipulation of new, unused brakes as well as from brake wear dust from used product (allegedly arising from "compressed air blowout," a method of the brake-maintenance process, or otherwise). These types of claims are not legally different from claims asserted against other asbestos-containing products.

There are, however, critical distinctions between Honeywell and other asbestos defendants in the tort system. Unlike other defendants, Honeywell has the unique benefit of a large and growing body of peer-reviewed studies specifically related to brakes manufactured with asbestos and potential exposures to brake dust among automotive mechanics. Epidemiological studies involving automobile mechanics over a forty-year period have consistently demonstrated that brake dust is different from raw or marginally processed asbestos, is not associated with disease and *does not* increase risk of disease.

Chrysotile was the only asbestos fiber type used historically in automotive brakes. There is scientific evidence that dust from brakes manufactured with chrysotile (whether generated from new brakes or debris from used brakes) is different from raw chrysotile asbestos. . . .

***

Although a significant body of published epidemiology, pathology, and industrial hygiene demonstrates that brake dust is not associated with disease and does not increase the risk of disease, there was no *product specific* toxicology study available on brake dust until recently: a more definitive 90-day inhalation study, comparing the impacts of brake dust, raw chrysotile, and raw amphibole asbestos is on-going. The results of such studies will have a critical impact on Honeywell's defense, as these studies will directly address the biologic impact of brake dust in contrast to raw asbestos. The results of this study are expected to be published over the next few years.

The results of toxicological and epidemiological studies published to date and discussed in Honeywell's response to the Staff's Comment Letter of May 24, 2018 are consistent with and support scientific knowledge regarding the nature of brake dust and the low level of processed fibers released during brake work. The combination of product specific scientific literature, along with toxicological and epidemiological studies that consistently demonstrate that brake dust is different from asbestos and *does not* increase risk of disease, distinguishes Honeywell from other asbestos defendants who, out of necessity, rely primarily on general literature relating to the correlation between dosing from exposure and biological response to unmodified chrysotile.

### *Response*

It is Honeywell's judgment, based upon its experience and the advice received from its outside counsel and its third-party actuarial expert, that a five-year time horizon is a reasonable estimate of the latest point at which its appellate and scientific strategies will have a material impact on key estimation inputs (claims filing patterns/rates, average resolution values, or both). Although many issuers facing asbestos liability have been able to estimate losses for unasserted claims for time

periods beyond five years, Honeywell is distinguishable from other issuers because of:

(1) on-going scientific research specifically concerning brake dust, such as animal inhalation studies referred to above and in Honeywell's response to the Staff's Comment Letter of May 24, 2018, that will continue to demonstrate the degree to which such dust is biologically active and that Honeywell anticipates will demonstrate brake dust from automotive brake linings (i.e., the Bendix product) does not cause disease, and

(2) Honeywell's aggressive pursuit of litigation strategies focused on strengthening product causation standards applied by the courts.

Honeywell believes that each of these factors will materially impact claim rates and claim resolution values. However, the impacts of newly available science, as well as the results of Honeywell's efforts to advocate for a return to traditional causation standards in asbestos tort cases, will not be realized immediately. Honeywell considers five years a reasonable outer limit for the period of time over which claim rates and claim resolution values would remain unaffected by current scientific developments and litigation activities. Honeywell believes that claim rates and claim resolution values cannot be reasonably estimated beyond such five-year period because it expects that current scientific developments and litigation strategies will impact litigation outcomes (including resolution values) and the profile of new claims filed by that time, but this impact cannot be known or reasonably predicted today.

Honeywell acknowledges that the five-year horizon is not a precise benchmark, but we believe it to be a reasonable exercise of judgment to use this time period. In Honeywell's experience, it generally takes 18 to 30 months from an initial trial date to obtain an intermediate appellate court decision, an additional 12 to 24 months to obtain the decision of a state's highest court (if review is accepted) and some additional months or years of litigation in trial courts to have any significant changes arising from that decision implemented in new court cases. This historical experience informs its expectation that the number of claims, the nature of the claims filed and their resolution values will be different five years in the future based on its pursuit of these issues and the increased barriers to recovery these strategies will create, but the magnitude of this difference cannot be reasonably estimated now.

\*\*\*

Taken together, the nature of the Bendix products, existing and anticipated scientific research concerning the potential health impacts of brake dust and the individualized and aggressive appellate litigation strategy that Honeywell is pursuing to change substantive and procedural standards applicable to claims render any estimation of liability beyond a period of five years unreliable.

Honeywell recognizes that other issuers defending claims arising out of asbestos exposure may be capable of generating reliable estimates over longer periods due to a less dynamic evidentiary and legal landscape, but it respectfully submits that these are not appropriate comparisons for Honeywell's particular circumstances.

2. *We note your response that liability estimates for future claims were developed with the assistance of a third party asbestos expert actuarial firm and outside legal counsel and probable asbestos claims beyond the five-year period is not reasonably estimable, although Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period. Please tell us whether you (1) attempted to estimate a liability for potential claims beyond the five year period but concluded the resulting estimate of loss (or range) was not reasonable or (2) did not attempt to estimate a liability beyond the five year period because you believed you could not develop a reasonable estimate. If the former, tell us the results of your estimation including your estimated liability (or range thereof) as of December 31, 2017 and why you did not believe the estimate(s) to be reasonable.*

Honeywell estimates its future liability for asbestos-related claims based upon three significant variables: (a) epidemiological projection of the future incidence of asbestos-related disease; (b) projected claims rates, including number, type and nature of claims filed against Honeywell drawn from Honeywell's recent claims experience; and (c) projected average claim resolution values, by type of claim, drawn from Honeywell's recent claims experience. As described in our response to Comment 1 above, Honeywell believes that two of the three variables (specifically, (b) and (c) above) cannot be reasonably estimated beyond a five-year period.

Notwithstanding this limitation, Honeywell applied variables (b) and (c) to the epidemiological projections in the manner used by Honeywell to calculate estimated losses during the five-year forecasting period spanning 2018-2022. Based on this mathematical extrapolation, such calculation generated an estimated reasonably possible exposure over the full term of the epidemiological projections for potential claims not yet asserted of $1.3 billion as of December 31, 2017.

However, for the reasons cited throughout this response, Honeywell does not believe that this or any other projection beyond a five-year period provides a reasonable estimate of probable and estimable liabilities given that any such projection would be based on the application of key variables that are unreliable beyond the immediate five-year term and would not give proper effect to the impact of scientific developments and Honeywell's aggressive litigation strategies.

3. *Please quantify for us the amount of the liability at December 31, 2016 that relates to potential claims not yet asserted.*

35

The amounts of liability that relate to potential Bendix claims not yet asserted at December 31, 2017 and 2016 are **$480 million** and **$483 million**, respectively.

(Footnote omitted; emphasis in original).

98. 

99.

100.

101.

---

[2]

102. ██████████████████████████████████

██████████████████████████████████████

███████████ ³

103. ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████

104. ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████

105.   On July 27, 2018 ████████████████████████ the SEC wrote to Lu

responding to her June 29, 2018 letter.  The SEC letter said

> <u>Response Letter Submitted June 29, 2018</u>
> <u>Notes to Combined Financial Statements</u>
> <u>Note 18. Commitments and Contingencies</u>
> <u>Asbestos Matters, page F-27</u>

1.   Please provide us a schedule of the aging of outstanding claims and claims
     settled over the last five years ended December 31, 2017.

---

³ ████████████████████████████████████████
████████████████████████████████

37

2.  We note from your representation during our conference call with you on July 25, 2018 that your external actuary provided, as part of its report, its view that Bendix liabilities could not be reasonably estimated beyond five years in conjunction with its work supporting the December 31, 2017 accrual. Please advise, and provide supporting documentation as appropriate, with regards to the following:

    1.  What was the external actuary specifically asked to do with regards to the period over which claims were reasonably estimable? Did the Company ask the actuary to confirm its view that five years was the period over which Bendix claims were reasonably estimable, or was the actuary requested to provide its independently determined view on what time period would be reasonably estimable?

    2.  You asserted that you believe that the same actuary has performed services relating to the Bendix accrual since 2006. During that time period, have there been any significant changes in what the actuary has been requested to do by the Company? Were there any changes that have occurred during the last three years (2015-2017)?

3.  In your response to comment 3 in your letter dated June 29, 2018, we understand that $480 million of the total $616 million Bendix liability at December 31 2017 relates to projected IBNR [Incurred But Not Reported] claims for the period 2018 through 2022. Please provide the breakdown of the estimated amount relating to each year during that period, as well as the underlying variables for the epidemiological projection of the future incidence of asbestos-related disease, projected claims rates against the Company, and average claim resolution values relating to each year.

4.  Based on your disclosures it appears that over the last 10 years you have had relatively consistent amounts of Bendix liabilities accruals and payouts. You have represented that during these years you believed that your litigation strategy and scientific information related to your product caused you to believe that after a five year period you could not reasonably estimate the claims that would be filed and the resolution rate for those claims.

    Please tell us if you believe that over the last 10 years your litigation strategy, scientific findings or other factors that you may have identified to support a five year IBNR accrual period have significantly reduced the claims filed against you or the resolution rate for those claims. If so, please provide data supporting this conclusion. If not, tell us whether you believe you should consider the fact that in the past these items have not caused the variability in future claims and resolutions you expected in your determination at each year-end from 2006-2017 and how those items prevented you from making a reasonable estimate beyond the next five years in light of that fact.

5.  In your June 29, 2018 response to our prior comment 2 of our letter dated June 21, 2018, you note that based on a mathematical extrapolation of projected claims rates and average resolution values, a reasonably possible exposure over the full term of the epidemiological projections for Bendix IBNR claims would be $1.3 billion. We understand that this would represent $820 million of reasonably possible additional exposure beyond what is recorded at December 31, 2017, extending over an approximate 30 year period beginning in 2023.

Please tell us how much of the incremental $820 million would be included if the IBNR estimate were extended based on this mathematical extrapolation: 1) an additional 5 years (2023-27) and 2) an additional 10 years (2023-32).

6.  Please provide us the accounting memoranda supporting the conclusion that Bendix related liabilities could not be reasonably estimated beyond a five year time horizon for each of the years ended December 31, 2013 through 2017.



109. 



110.

111.



112.



113.    Garrett Filed Amendment No. 2 to the Draft Registration Statement on August 8,

2018.  The same day, Lu wrote to the SEC on behalf of Garrett and stated:

> Reference is made to the letter from the Staff of the Division of Corporation
> Finance (the "Staff"), dated July 27, 2018 (the "Comment Letter"), regarding the
> Registration Statement. The Company [i.e., Garrett] acknowledges the Staff's
> comments set forth in the Comment Letter and in the Staff's prior letters to the
> Company dated May 24, 2018 and June 21, 2018 related to the Company's Notes
> to Combined Financial Statements, Note 18. Commitments and Contingencies,
> Asbestos Matters. Amendment No. 2 reflects the responses of the Company to such
> comments and the inclusion of certain other information in order to comply with
> the requirements under the Commission's rules and regulations. Certain capitalized
> terms set forth in this letter are used as defined in Amendment No. 2. For your
> convenience, we have provided you with hard copies of Amendment No. 2, marked
> to show changes from Amendment No. 1 to the Registration Statement.
>
> Upon thorough and thoughtful consideration of the Staff's comments and of the
> appropriate application of Accounting Standards Codification 450, Contingencies
> ("ASC 450"), *Honeywell has determined that it had not appropriately applied the*
> *provisions of ASC 450 when measuring its asbestos liabilities related to unasserted*
> *Bendix claims. Specifically, Honeywell concluded that the appropriate application*
> *of ASC 450 with respect to unasserted Bendix-related asbestos claims is to reflect*

*the full term of the epidemiological projections in its measurement of such liability.* Such determination was made primarily in consideration of:

(1) the subjective nature of applying a five-year or any other fixed time horizon when estimating liability for unasserted Bendix-related asbestos claims, given the absence of adequate objective and verifiable data to support the inability to reasonably estimate these liabilities beyond a specific time period,

(2) recent changes by several other registrants to accrue for unasserted asbestos claims over the full term of the epidemiological projections, which Honeywell now believes is indicative of the emerging trend that inclusion of all potentially relevant years in the measurement of liability for future asbestos claims is the appropriate application of generally accepted accounting principles absent adequate objective and verifiable data to support a specific time period, and

(3) the desire to facilitate comparability among Honeywell, the Company and our respective peer companies who have increasingly adopted a full term horizon when applying ASC 450.

As a result of the foregoing, Honeywell plans to revise its historical consolidated financial statements in future filings to reflect the full term of the epidemiological projections in its measurement of liability for unasserted Bendix-related asbestos claims. While immaterial to Honeywell, this planned revision of Honeywell's historical consolidated financial statements has resulted in a restatement of the Company's historical Combined Financial Statements. Among other things, Amendment No. 2 reflects this restatement as well as a discussion of the material weakness in the Company's internal control over financial reporting that accompanied the restatement.

Given the foregoing decision to restate our Combined Financial Statements to reflect the full term of the epidemiological projections in the measurement of this liability, we respectfully advise the Staff that it is our belief that the information we were requested to provide in the Comment Letter – information that would support the application of a 5-year time horizon – is no longer applicable to the Staff's review of our Amendment No. 2 or the restated Combined Financial Statements contained therein.

(Emphasis added).

114. ████████████████████████████████████████

████████████████████████████████████████████████

████████

115. On August 14, 2018, the SEC wrote to Honeywell with the following comment on the 2017 Form 10-K:

> We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO-related asbestos liability. In your response, also please provide us with an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods. To the extent you determine that the specific future time periods used were incorrect, please provide us with a materiality analysis and your assessment of whether there was a material weakness in internal controls over financial reporting.

116. This correspondence was not released to the public until October 10, 2018.

117. ████████████████████████████████████████████

████████████████████████████████████████████

118. Honeywell responded to the SEC on August 20, 2018, stating in relevant part:

> ***Executive Summary***
>
> We have used different methodologies for estimating asbestos-related liabilities for Bendix and for the NARCO Trust due to the significant distinctions in claims data and histories between the two sets of asbestos-related liabilities. Due to the inherent complexities of modeling numerous layers of uncertain inputs, Honeywell continues to believe that it is critical to retain outside asbestos liability valuation expertise to support our preparation of liability estimates. The fundamental difference between estimating liability for Bendix and the NARCO Trust is the availability of a robust quantity and quality of information (or in the NARCO Trust case, the lack thereof) that has been available for us to use when attempting to make reasonable estimates of our contingent liability. This is critical to understanding why we have used different methods to determine our reasonable estimates, for ASC 450-20 purposes, of our Bendix-related asbestos and NARCO Trust-related asbestos liabilities. We outline below the facts and circumstances behind each of Bendix and the NARCO Trust to clearly differentiate the two and to explain why we have handled the accounting estimates in two different ways. As described in more detail below and in the Appendices hereto, we are proposing to change our accounting treatment for Bendix asbestos-related liabilities to a terminal value time horizon. We also discuss our materiality analysis related to that revision and our conclusion that the revision we intend to make does not indicate a material weakness in our internal control over financial reporting. For NARCO Trust asbestos-related liabilities, we believe based on the absence of reliable claims data,

that our current projection of liability is correct as it is the best available estimate and have described in detail our process and position based on the available facts.

Accounting Standards Codification 450, Contingencies ("ASC 450"), the authoritative accounting standard under U.S. GAAP concerning loss contingencies, provides that a company must accrue for a loss when that loss is both probable and reasonably estimable (ASC 450-20-25-2). If a loss is reasonably possible but not probable and is reasonably estimable, then ASC 450-20-50-3 directs that a company disclose that contingent loss but not record an accrual. ASC 450-20 makes clear that the same standards for accrual and disclosure of contingent liabilities apply to both unasserted claims as well as asserted claims. Specifically, ASC 450-20-55-14 provides, "[w]ith respect to unasserted claims and assessments, an entity must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. If an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required by paragraph 450-20-25-2." We have applied the requirements of ASC 450-20 both for our Bendix and NARCO Trust asbestos-related liabilities.

For Bendix, we believe that the accrual after the change to a terminal value horizon is appropriate as it is probable and reasonably estimable given the quality and quantity of reliable claims data in the tort system. For the NARCO Trust, we believe that an accrual is necessary despite the challenges of estimating that accrual without sufficiently reliable data, and we believe our accrual estimation methodology (established in 2002) is the most reasonable approach in the absence of a more robust and reliable data set. The Company has attempted to generate a better estimate of the accrual with the assistance of external experts (valuation experts and law firms) who concur with our assessment that the current inadequate data set does not present an opportunity to further refine the accrual.

### Bendix

Upon thorough consideration of the Staff's comments in its review of the Form 10 submitted to the Staff in connection with the proposed spin-off of Garrett Motion Inc. and of the application of ASC 450, Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims. Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability. The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims.

It is important to note that, unlike the NARCO Trust, Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical

claims information on which to rely when estimating a future projection of liability. Each year, we have a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates. The robustness of this data supported our conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450.

As further discussed in Appendix A, Section 1 (Materiality Assessment), Honeywell does not believe that the above-described change in accounting reflects a material error. In addition, as further discussed in Appendix A, Section 2 (SOX 404 Internal Control Assessment), Honeywell does not believe that the control deficiency that gave rise to the error represents a material weakness in internal control over financial reporting.

***

As stated above, we continue to evaluate the appropriateness of the $743 million accrual annually and have understood and expected from the outset that once sufficient valid and representative claims data have been accumulated to support a probable and reasonably estimable determination of liability under ASC 450, the model for estimating NARCO Trust Liability will be adjusted to reflect that information and we, together with our third party specialists, intend to continuously monitor NARCO claims submissions and processing accordingly to ensure we can credibly make an adjustment to our estimate for future NARCO Trust Liability at the earliest possible opportunity.

We recognize that more detail could have been included in our existing disclosure in the Form 10-K for the fiscal year ended December 31, 2017, Note 19. Commitments and Contingencies, pertaining to our accounting related to NARCO Trust Liability and we will plan to include more detail in future filings.[5]

119.   This correspondence was not released to the public until October 10, 2018.

120.   ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] ██████████████████████████████████████████ This document was not produced by Honeywell.

47



121. █████████████████████████████████

122. █████████████████████████████████

### THE TRUTH BEGINS TO EMERGE

123.   Honeywell's 8-K disclosure statement ████████████████████

████████████████████████████ was filed prior to the opening of trading

on August 23, 2018.  It stated:

> During the course of the Securities and Exchange Commission (SEC) review of the Form 10 filing for the planned spin-off of its Transportation Systems business, Garrett Motion Inc. ("Garrett"), Honeywell International Inc. ("Honeywell", the "Company" or "We") has been engaged in discussions with the staff of the SEC (the "Staff") regarding Garrett's accounting for its liability for unasserted Bendix-related asbestos claims and, in conjunction therewith, reviewed the accounting treatment of its legacy Bendix asbestos liabilities. The Staff's comments related to Garrett's accounting in this area are also applicable to Honeywell's historical financial statements.

> Following these discussions, the Company revised its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims in accordance with Accounting Standards Codification 450, *Contingencies* ("ASC 450"). The prior accounting treatment, disclosed in our footnotes to our historical financial statements, applied a five-year time horizon; the revised treatment reflects the full

term of epidemiological projections through 2059. The change was made in consideration of a number of factors, including the subjective nature of applying a five-year or any other fixed time horizon when estimating liability for unasserted claims, recent changes by several other registrants to accrue for unasserted asbestos claims over the full term of the epidemiological projections and the desire to facilitate comparability among Honeywell, Garrett and their respective peers.

Our consolidated balance sheets, consolidated statements of operations, consolidated statements of comprehensive income, consolidated statements of shareholders' equity, and consolidated statements of cash flows relative to prior periods will be immaterially revised to correct the Company's application of ASC 450 with respect to Bendix-related asbestos liabilities. We assessed the materiality of this revision to prior periods' financial statements in accordance with SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99") and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, codified in ASC 250, *Presentation of Financial Statements*. The Company concluded that the revision was not material to any prior period financial statements, and therefore prior periods will be revised when they are presented in reports to be filed for future periods. A summary of these revisions is presented in Exhibit 99 furnished herewith. The accounting revision will have an immaterial positive impact to Honeywell's full-year 2018 earnings per share, but will have no material impact on operating income and no impact to net sales, segment margin, or operating cash flow.

The impact of the above revisions on the Company's previously reported consolidated balance sheets, certain net income and earnings per share information, certain illustrative disclosures regarding the Company's revised Bendix asbestos liability information which will be reflected in the Company's future filings, and certain disclosures from the Company's press release dated January 26, 2018, are presented in Exhibit 99 furnished herewith.

Honeywell also received a comment from the Staff regarding the Company's estimate of its NARCO-related asbestos liability. We have concluded review of our accounting for asbestos-related liabilities, and it has been determined that no change to such estimate is required for any previously reported period.

124.    The exhibit to the Form 8-K explained:

The Company has revised its method for reasonably estimating its liability for unasserted Bendix asbestos-related claims by considering the epidemiological projections through 2059 of future incidence of Bendix asbestos-related disease. Using this method, the Company's Bendix asbestos-related liability is estimated to be $1,693 million as of June 30, 2018. *This is $1,083 million higher than the Company's prior estimation which applied a five-year horizon when estimating the liability for unasserted Bendix asbestos-related claims.* The Bendix asbestos-related insurance assets are estimated to be $187 million as of June 30, 2018, which is $65 million higher than the Company's prior estimate.

49

***

It is not possible to predict whether resolution values for Bendix-related asbestos claims will increase, decrease or stabilize in the future.

Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and unasserted Bendix-related asbestos claims. We have valued Bendix pending and unasserted claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and unasserted claims during the fourth quarter of each year.

Honeywell now reflects the inclusion of all years through 2059 rather than a subset of future years when estimating the liability for unasserted Bendix-related asbestos claims. Such estimated cost of unasserted Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years.

Our insurance receivable corresponding to the liability for settlement of pending and unasserted Bendix-related asbestos claims reflects coverage which is provided by a large number of insurance policies written by dozens of insurance companies in both the domestic insurance market and the London excess market. Based on our ongoing analysis of the probable insurance recovery, insurance receivables are recorded in our Consolidated Financial Statements simultaneous with the recording of the estimated liability for the underlying asbestos claims. This determination is based on our analysis of the underlying insurance policies, our historical experience with our insurers, our ongoing review of the solvency of our insurers, judicial determinations relevant to insurance programs, and our consideration of the impacts of any settlements reached with our insurers.

(Emphasis added).

125.    Garrett's Registration Statement was filed almost simultaneously with Honeywell's August 23, 2018 Form 8-K.  In addition, Honeywell announced in a press release it was "rais[ing] its full-year 2018 adjusted earnings per share guidance by five cents to a new range of $8.10 to $8.20 primarily to reflect continued confidence in the strength of its end markets and growth in long-cycle orders and backlog, as well as an accounting change related to Bendix asbestos liabilities," nullifying the negative news in the Form 8-K.

### THE TRUTH IS REVEALED

50

126.     On October 10, 2018, the SEC released during trading hours its August 14 and 20 correspondence with Honeywell regarding its asbestos liability accrual.  Shares of Honeywell stock, which closed at $159.93 per share on October 9, 2018, lost $4.30 per share, or 2.7%, to close at $155.63 on October 10.  By October 11, Honeywell's shares had fallen to a closing price of $152.65.

127.     On October 19, 2018, Honeywell filed its Form 10-Q for the quarter ended September 30, 2018.  The Form 10-Q reported the change to the Bendix asbestos liability accrual methodology and provided updated asbestos liability and insurance coverage as of December 31, 2017.

128.     The Form 10-Q also stated the Company was advised by the SEC on September 13, 2018, "following completion of Corporation Finance's review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter. Honeywell intends to provide requested information and otherwise fully cooperate with the SEC staff."

129.     The Form 10-Q was filed prior to the opening of trading on October 19.  Shares of Honeywell stock, which closed at $154.21 per share on October 18, 2018, lost $1.71, or 1.1%, to close at $152.50.  By October 29, 2018, the share price of Honeywell stock had steadily declined to a closing price of $141.06, a decline of 8.5% since October 18.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY
## RESULT IN A KEY IMPROPER STATEMENT

130.     As detailed below, the Individual Defendants made, or allowed the Company to make, repeated improper statements about Honeywell's Bendix legacy asbestos-related liability.

131.     The 2Q18 was filed on July 20, 2018.

132.    The 2Q18 showed Honeywell's Bendix asbestos liability to be $616 million as of December 31, 2017 and $610 million as of June 30, 2018.  It also indicated Honeywell's insurance recoveries for the two periods were $123 million and $122 million.

133.    Those figures were materially changed on August 23, 2018, when the Company disclosed its Bendix legacy asbestos-related liability was actually $1,703 million as of December 31, 2017 and $1,693 million as of June 30, 2018, and its insurance recoveries were $191 million and $187 million for the respective periods.

134.    The 2Q18 falsely stated:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. *In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.* The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

(Emphasis added).

135.    This statement, and the Bendix asbestos liability figures, were provided *after* Garrett and the SEC had exchanged correspondence on the topic of Honeywell's five-year time horizon on May 24, June 8, June 21, June 29, and July 30, 2018 ███████████████████ ████████████████████████ prior to July 20.

136. 

137.

138. ███████████ the Company filed the 2Q18 ███████████ July 20, 2018, with the false and misleading statements about the Company's Bendix asbestos liability.

139. The 2Q18 was signed by Tus and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Director Defendant Adamczyk and Individual Defendant Szlosek. Adamczyk's and Szlosek's certifications acknowledged their responsibility "for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting ... for [Honeywell]," and falsely stated that they had:

a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our

supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

140.   Director Defendant Adamczyk and Individual Defendant Szlosek also falsely asserted that they had disclosed any deficiencies and material weaknesses in the Company's internal controls, including:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## DAMAGES TO HONEYWELL

141.   As a direct and proximate result of the Individual Defendants' actions, Honeywell has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any judgment or settlement in the *Kanefsky* securities class action;

(b)  costs incurred from defending the SEC investigation and paying any fines or penalties resulting therefrom;

(c) costs incurred in implementing corrective and remedial actions to fix the control deficiency that gave rise to the Bendix asbestos liability error; and

(d) costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Honeywell.

142.    The Company's failure to adhere to GAAP, the Individual Defendants' breaches of fiduciary duties, and the Audit Committee Defendants' failure to comply with the Committee charter and the Business Code of Conduct all exposed Honeywell to significant reputational damage among consumers and the business community. Consumers and businesses value companies that live up to the ethical standards they espouse.

143.    Honeywell's ability to attract investors is also impaired. In addition to price, Honeywell's current and potential investors consider a company's trustworthiness, stability, and commitment to corporate responsibility.  Investors are less likely to invest in companies that fail to comply with their own internal protocols and external regulations and knowingly conceal adverse information.  As discussed above, the price of Honeywell's stock dropped significantly after the truth behind Honeywell's accounting failures became public.  In addition, Honeywell's ability to raise equity capital or debt on favorable terms in the future is also now impaired. The Company stands to incur higher marginal costs of capital and debt, because the improprieties detailed herein have materially increased the perceived risks of investing in and lending money to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

144.    Plaintiff brings this action derivatively in the right and for the benefit of Honeywell to redress injuries suffered, and to be suffered, by Honeywell as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well

as the aiding and abetting thereof, by the Individual Defendants.  Honeywell is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145.    Plaintiff will adequately and fairly represent the interests of Honeywell in enforcing and prosecuting its rights.

146.    Plaintiff was a stockholder of Honeywell at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Honeywell stockholder.

147.    The current Board of Honeywell consists of the following twelve individuals: Adamczyk, Angove, Ayer, Burke, Davis, Deily, Gregg, Hollick, Lieblein, Pardo, Paz, and Washington.  All twelve directors were members of the Board at all times during the Relevant Period.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

A.    **Demand is excused because the Audit Committee Defendants – Burke, Davis, Deily, Gregg, Paz, and Washington, a Majority of the Board – Face a Substantial Likelihood of Liability for Their Misconduct**

148.    Audit Committee Defendants Burke, Davis, Deily, Gregg, Paz, and Washington breached their fiduciary duties of loyalty and good faith by failing to ascertain that Honeywell's accounting for its Bendix legacy asbestos-related liability did not comply with ASC 450 and, *having told as such by the SEC*, nevertheless approved the 2Q18, which continued to apply a five-year timeline to the Company's Bendix liability under the debunked claim that "we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years."

149.    By willfully or recklessly ignoring the obvious and pervasive problems with Honeywell's internal controls, practices, and procedures, which the SEC had repeatedly pointed

out, and by failing to make a good faith effort to correct the problems in the 2Q18, the Audit Committee defendants breached their fiduciary duties of loyalty and good faith.

150.    According to its charter, the Audit Committee was responsible for, among other things, "[r]eview[ing] with management and the independent auditors, *prior to the filing thereof,* the Company's annual and interim financial results (including Management's Discussion and Analysis) to be included in Forms 10-K and 10-Q, respectively, and the matters required to be communicated to the Audit Committee *under generally accepted auditing standards and rules of the Securities and Exchange Commission. . . .*"  (Emphasis added).  ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  Nevertheless, the Committee knowingly allowed the 2Q18 to be filed without any changes to the Company's standard language about the determination of Honeywell's Bendix asbestos liability or without updating its financial statements to show the true extent of that liability.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.

151.    The Audit Committee Defendants also violated Honeywell's Code of Business Conduct by "mak[ing] a false representation in Company documents" and by failing to "comply with the legal and regulatory requirements that govern [SEC] reports."

152.    For the foregoing reasons, the Audit Committee Defendants stand a substantial likelihood of liability if they were to initiate litigation against themselves.

153.    The six-person Audit Committee constitutes a majority of the twelve-person Board. As a result, demand is futile on the entire Board.

**B.      Demand is Excused With Respect to Director Defendant Adamczyk**

154.    Director Defendant Adamczyk is a defendant in the *Kanefsky* securities class action.  He will not vote to initiate litigation against himself because doing so will compromise his defense of the *Kanefsky* action.

155.    Adamczyk is a non-independent member of the Board who earned a total of $18,418,024 in compensation, a material amount to anyone, as the CEO of Honeywell in 2018. Adamczyk will not do anything to jeopardize his outsized annual compensation such as agreeing to initiate litigation against himself and his colleagues on the Board, who determine his compensation.

156.    In addition, as Honeywell CEO, Adamczyk was fully aware of the status of the Bendix asbestos liability accounting issue both through his involvement in the Garrett spin-off and through his participation ███████████████████████████████

157.    As such, Adamczyk made false SOX certifications in support of the 2Q18.

158.    For these reasons, demand is futile with respect to Adamczyk.

159.    The total number of directors for whom demand is futile thus is a minimum of seven, a clear majority of the Board.

## COUNT I

### Against the Individual Defendants for Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.    During the Relevant Period, the Individual Defendants disseminated or approved false or misleading statements about Honeywell, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or

misleading statements and the Individual Defendants' course of conduct artificially inflated the price of the Company's common stock.

162.   The Individual Defendants violated section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 in that they:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.   The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Honeywell stock, which were intended to, and did:  (a) deceive Honeywell and its stockholders regarding, among other things, the Company's operations and financial prospects; and (b) artificially inflate and maintain the market price of Honeywell stock.  Throughout the Relevant Period, the Individual Defendants were in possession of material, nonpublic information regarding the above.

164.   The Individual Defendants were the directors and the senior management of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

165.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.   The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that they should have been aware of them.   Throughout the period of wrongdoing, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

166.    As a result of the Individual Defendants' misconduct, Honeywell has and will suffer damages in that it suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

167.    By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

168.    Plaintiff brings this claim within two years of the discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants owed and owe Honeywell fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Honeywell the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of Honeywell's compliance

with laws, regulations, standards, and internal policies concerning financial reporting and internal controls.

171.   The Individual Defendants violated and breached their fiduciary duties of good faith and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

172.   The Individual Defendants, and particularly the Audit Committee Defendants, Director Defendant Adamczyk, and Individual Defendants Cote, Szlosek, and Lewis, all breached their fiduciary duties by knowingly, recklessly, or with gross negligence failing to ensure that Honeywell had adequate internal controls, risk management procedures, and other policies to ensure compliance with federal securities laws, GAAP, the Company's Business Code of Conduct, and other mandatory standards.

173.   The Audit Committee Defendants, Director Defendant Adamczyk, and Individual Defendant Szlosek all breached their fiduciary duties by knowingly, recklessly, or with gross negligence approving, authorizing, filing, or failing to prevent the filing of the 2Q18, which they knew contained materially false and misleading information.

174.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Honeywell has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these Defendants are liable to the Company.

175.   Plaintiff, on behalf of Honeywell, has no adequate remedy at law.

## **COUNT III**

**Against the Individual Defendants for Waste of Corporate Assets**

176.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.   The Director Defendants knowingly unheeded their corporate stewardship responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Honeywell by failing to address the Company's control deficiencies and thereby issuing false and misleading statements about its Bendix legacy asbestos liability, and by approving excessive compensation packages to themselves and Individual Defendants Adamczyk and Cote at the time they were directly and actively contributing to the creation and perpetuation of these violations of the Securities Exchange Act and breaching their fiduciary duties of loyalty and good faith.  All compensation to the Individual Defendants was a waste of Honeywell's corporate assets.

178.   As a result of the misconduct described above, the Individual Defendants have also wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the *Kanefsky* securities class action and the SEC's investigation that they brought on with their improper statements and their breaches of fiduciary duties.

179.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

180.   Plaintiff, on behalf of Honeywell, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

181.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Honeywell.  The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Honeywell.

183.    Plaintiff, as a stockholder and representative of Honeywell, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

184.    Plaintiff, on behalf of Honeywell, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of Honeywell, demands judgment and relief as follows:

A.      Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Honeywell to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Honeywell and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen Honeywell's oversight of its financial reporting and disclosure procedures;

2.      a proposal for the Company to engage a new independent auditor;

3.      a proposal to require that at least one member of the Audit Committee have expertise in public company accounting requirements; and

4.      a proposal to replace three of the longest-serving Board members with three new Board members.

C.      Awarding to Honeywell restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

D.      Declaring that Defendants violated Section 10(b) of the Securities Exchange Act, as well as Rule 10b-5 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys', accountants', and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: May 14, 2019                    **RIGRODSKY & LONG, P.A.**

                                       By:  */s/ Brian D. Long*
                                            Seth D. Rigrodsky (#3147)
                                            Brian D. Long (#4347)
                                            Gina M. Serra (#5387)
                                            300 Delaware Avenue, Suite 1220
                                            Wilmington, DE 19801
**OF COUNSEL:**                              Telephone: (302) 295-5310
                                            Facsimile: (302) 654-7530
**GRABAR LAW OFFICE**                        Email:  sdr@rl-legal.com
Joshua H. Grabar                            Email:  bdl@rl-legal.com
1735 Market Street, Suite 3750              Email:  gms@rl-legal.com
Philadelphia, PA 19103
(267) 507-6085                              *Attorneys for Plaintiff*